Ryan Morrison*
**LIBERTY JUSTICE CENTER**
1629 K St., NW, Ste. 300
Washington, DC 20006
T: 512-481-4400
rmorrison@ljc.org

Gage Zobell (#13925)
Jensen Lillquist (#3252)
**DORSEY & WHITNEY LLP**
Millennium Building
125 Bank Street, Suite 600
Missoula, MT 59802
T: (406) 721-6025
zobell.gage@dorsey.com
lillquist.jensen@dorsey.com

*Attorneys for Plaintiffs*
* *Pro Hac Vice* Forthcoming

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| YOUNG AMERICANS FOR LIBERTY, INC., MAKE LIBERTY WIN, MONTANA MINING ASSOCIATION, and PAC MANAGEMENT SERVICES LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>AUSTIN KNUDSEN, *in his official capacity as Montana Attorney General*, and CHRISTI JACOBSEN, *in her official capacity as Montana Secretary of State*,<br><br>*Defendants*. | Case No. 26-cv-81-H-BMM<br><br>**Complaint** |

## Introduction

1. The First Amendment protects the freedoms of speech and association so that individuals and political groups can work together to speak on matters of public concern and influence the outcome of a vote of the electorate.

2. Each election season, Make Liberty Win organizes thousands of activists to reach out to voters and ask them to vote for liberty minded candidates for public office, including candidates running in Montana.

3. Young Americans for Liberty, Inc. is dedicated to promoting and advancing the principles of liberty and freedom. It spends money to support groups, like Make Liberty Win, to help them connect with voters to promote conservative candidates and issues each election season.

4. The Montana Mining Association exists to protect and promote Montana's mining industry. It achieves these goals by speaking out each election season to influence the outcome of candidate elections, ballot initiatives, voter referendums, candidate recalls, constitutional amendment votes, charter amendment votes, or any other question presented to voters state-wide or in any Montana political subdivision.

5. PAC Management Services LLC is a for-profit limited liability company that provides services to state and federal political action committees, candidate committees, party committees, and other organizations engaged in political and other advocacy work to help them influence the outcome of elections across the Nation.

6. On November 3, 2026, Montana voters approved Initiative 194. That ballot initiative explicitly takes away these organizations' free speech rights and the ability to work together to either advocate for liberty minded candidates for public office or promote Montana's mining industry during the state's elections. It also prevents companies like PAC Management Services LLC from selling its services because what it does will influence the outcome of Montana's elections.

7. The First Amendment, however, preserves the speech and associational rights of minority political groups and individuals. It prevents any level of government, and even the voters, from taking away the rights of people that express views that differ from the majority. It also protects the association rights of vendors and political organizations so that they can work together to influence elections.

Accordingly, the Court should enjoin Initiative 194 and declare it unconstitutional.

**Parties**

8. Plaintiff Young Americans for Liberty, Inc. is a 26 U.S.C. § 501(c)(4) corporation organized under the laws of Virginia.

9. Plaintiff Make Liberty Win is a federal hybrid political action committee, with Federal Election Committee Identification #C00731133.

10. Plaintiff Montana Mining Association is a 26 U.S.C. § 501(c)(6) trade association organized under the laws of Montana.

11. Plaintiff PAC Management Services LLC is a Delaware limited liability company.

12. Defendant Austin Knudsen is Montana's Attorney General. He is sued in his official capacity. Under I-194 § 8(2), the Attorney General has "the authority and responsibility to bring actions to enforce" I-194. He maintains his office in Helena, Lewis and Clark County, Montana.

13. Defendant Christi Jacobsen is Montana's Secretary of State. She is sued in her official capacity. She maintains her office in Helena, Lewis and Clark County, Montana. I-194 directs the Secretary of State

to "adopt rules and procedures necessary to implement and enforce [I-194], including procedures governing forfeiture, reinstatement, disgorgement, certification of compliance, notice, and the opportunity to be heard consistent with due process." I-194 § 8(1). The Secretary of State also administers business-entity filings, registrations, and records under Title 35 of the Montana Code Annotated, which I-194 makes applicable to its operative provisions. I-194 § 13.

**Jurisdiction and Venue**

14. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this lawsuit challenges Defendants' violation of Plaintiffs' civil rights under 42 U.S.C. § 1983. The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

15. Venue lies in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because the Defendants' offices are located in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Venue is proper in the Helena Division under L.R. 1.2(c)(4) and L.R. 3.2 because Defendants maintain their official offices in Lewis and Clark County.

## Factual Allegations

### Initiative No. 194

16. Initiative No. 194 ("I-194") was a ballot initiative that voters approved at the November 3, 2026 general election. I-194 enacts a new chapter in Title 35 of the Montana Code.

17. The stated purposes of the new law are to:

> (a) establish that state-conferred legal status and charter privileges are granted to an artificial person only on the condition that the artificial person operate within the powers extended by the state;
>
> (b) make explicit that political spending power is not among the powers extended to artificial persons, except as expressly provided by law for political committees;
>
> (c) establish a single, uniform definition of the powers extended to artificial persons under [sections 1 through 10];
>
> (d) provide clear and enforceable consequences for the exercise of political spending power not extended by the state; and
>
> (e) leave wholly undisturbed the constitutional rights of natural persons.

I-194 § 2(6) (brackets in original).

18. The definition section states:

> As used in [sections 1 through 10], and solely for the purposes of defining the scope of artificial-person powers and the consequences that attach to acts outside that scope, the following definitions apply:

(1) “Artificial person” means an entity whose existence, legal status, or limited liability shield is conferred by the laws of the state of Montana, including an entity organized or existing under the laws of another jurisdiction that is authorized to transact business, is otherwise transacting business, or holds property in Montana. An entity organized or existing under the laws of another jurisdiction that directly or indirectly undertakes, finances, or directs the exercise of political spending power in the state of Montana is conclusively considered to be transacting business in this state for the purposes of [sections 1 through 10].

(2) “Artificial-person powers” means powers necessary or convenient to carry out lawful business, charitable, cooperative, or organizational purposes as provided by Montana law, excluding political spending power. Political spending power may not be deemed necessary or convenient under any circumstances.

(3) “Charter privilege” means any legal benefit that exists only because the state of Montana confers it on an artificial person, including limited liability, perpetual duration, succession in entity name, or any statutory limitation on personal liability.

(4) (a) “Political spending power” means the legal capacity to pay, contribute, or expend money or anything of value to support or oppose:

> (i) a candidate, political party, or political committee in an election held in this state; or
>
> (ii) any initiative, referendum, recall, constitutional amendment, charter amendment, or other question formally certified or submitted to the electors of this state or any political subdivision of the state.

> (b) The term does not include the distribution of bona fide news, commentary, or editorial content unless the publishing entity is owned or controlled by a political party, a political committee, or a candidate.
>
> (c) Political spending power may be exercised by political committees, as provided by law.

I-194 § 3 (brackets in original).

19. I-194's general rule provided:

> (1) Except as expressly provided by law for political committees, the state of Montana does not extend political spending power to an artificial person, and an artificial person subject to [sections 1 through 10] does not possess any legal capacity to expend money or anything of value to support or oppose the outcome of a vote of the electorate.
>
> (2) The absence of political spending power under [sections 1 through 10] is a condition of state-conferred legal status and charter privileges. An artificial person that exercises political spending power not extended by the state acts outside the powers granted as a condition of that status.

I-194 § 4 (brackets in original).

20. I-194's applicability section states:

> (1) [Sections 1 through 10] apply to all artificial persons formed, organized, or existing under the laws of the state of Montana.
>
> (2) [Sections 1 through 10] apply to an artificial person organized or existing under the laws of another jurisdiction that is authorized to transact business, is otherwise transacting business, or holds property in the state.

> (3) [Sections 1 through 10] apply to any trust, statutory trust, business trust, or similar arrangement to the extent Montana law confers limited liability, perpetual duration, succession in name, or any other charter privilege by reason of that form.
>
> (4) [Sections 1 through 10] do not apply to:
>
> > (a) natural persons acting solely in an individual capacity;
> >
> > (b) the state of Montana or any agency, authority, or political subdivision of the State; or
> >
> > (c) a public body corporate and politic expressly identified as corporate and politic by statute.
>
> (5) [Sections 1 through 10] do not restrict the lawful activities of political committees organized under Montana law or federal law.

I-194 § 5 (brackets in original).

21. I-194 states that any act of political spending by an artificial person is void. Specifically:

> (1) An act by an artificial person that constitutes an exercise of political spending power not extended by the state under [sections 1 through 10] is beyond the scope of authority and void.
>
> (2) An act described in subsection (1):
>
> > (a) is void from the beginning;

> > (b) may not be ratified, validated, or given effect by consent, waiver, estoppel, reliance, course of dealing, or any other equitable doctrine; and
> >
> > (c) creates no enforceable rights, obligations, or defenses.
>
> (3) The character of an act that is beyond the scope of authority under this section arises solely from the absence of political spending power as a condition of state-conferred legal status and charter privileges.

I-194 §6 (brackets in original).

22. I-194 imposes penalties on offending artificial persons.

Specifically:

> (1) An artificial person that exercises political spending power not extended by the state under [sections 1 through 10] forfeits all charter privileges as a matter of law.
>
> (2) Charter privileges forfeited under subsection (1) include, without limitation:
>
> > (a) limited liability;
> >
> > (b) perpetual duration;
> >
> > (c) succession in entity name; and
> >
> > (d) any statutory limitation on personal liability conferred by Montana law.
>
> (3) Forfeiture under this section applies only to charter privileges conferred by Montana law. [Sections 1 through 10] do not purport to affect privileges conferred by the laws of another jurisdiction.

> (4) An artificial person whose charter privileges are forfeited under this section may be reinstated only pursuant to procedures enacted or administered by the state and only upon:
>
> > (a) full disgorgement of all money or things of value expended, contributed, or transferred in the exercise of political spending power;
> >
> > (b) certification of future compliance with [sections 1 through 10]; and
> >
> > (c) satisfaction of any additional conditions the legislature or a designated state authority considers appropriate.
>
> (5) Disgorgement under subsection (4)(a) is required regardless of whether the political spending supported or opposed a position that prevailed or failed in the outcome of a vote of the electorate.

I-194 § 7 (brackets in original).

23. Montana's Secretary of State is instructed to "adopt rules and procedures necessary to implement and enforce [sections 1 through 10], including procedures governing forfeiture, reinstatement, disgorgement, certification of compliance, notice, and the opportunity to be heard consistent with due process." I-194 § 8(1) (brackets in original).

24. Montana's Attorney General has the responsibility of enforcing I-194. Specifically: "The attorney general has the authority and

responsibility to bring actions to enforce [sections 1 through 10], including actions seeking declaratory relief, injunctive relief, disgorgement, and confirmation or enforcement of forfeiture." I-194 § 8(2) (brackets in original).

25. I-194 codifies these new laws as a new chapter in Title 35 of the Montana Code Annotated and "the provisions of Title 35 apply to [sections 1 through 10]." I-194 § 13 (brackets in original).

26. The effective date of these new laws is January 1, 2027. I-194 § 14.

**Young Americans for Liberty, Inc.**

27. Young Americans for Liberty, Inc. ("YAL") is a liberty focused organization that exists to advance liberty across the United States, including Montana.

28. YAL is an entity whose existence is conferred on it by the Commonwealth of Virginia.

29. It is an "artificial person" as defined in I-194 § 3.

30. YAL is not owned by any candidate, political party, or political committee.

31. A way that YAL pursues its goals is by associating with Plaintiff Make Liberty Win.

32. In 2025, YAL contributed over $3.5 million to Make Liberty Win.

33. In 2026, YAL contributed over $1.3 million to Make Liberty Win.

34. Make Liberty Win used a portion of YAL's contributions to support or oppose the outcome of a vote of the Montana electorate, specifically during the 2026 primary elections.

35. YAL has actual knowledge of, encourages, and supports Make Liberty Win's use of its financial contributions to support or oppose the outcome of a vote of the Montana electorate.

36. By associating with Make Liberty Win through its financial contributions prior to and during the 2026 election cycle, and by expending money or something of value through the work of its staff and the use of its supplies and resources, YAL indirectly financed the exercise of political spending power, as defined in I-194 § 3, in the state of Montana by expending money or something of value to support or oppose the outcome of a vote of the Montana electorate.

37. During each and every election cycle in Montana after the 2026 election cycle, YAL intends to and will continue to associate with Make

Liberty Win by contributing money and by expending money or something of value through the work of its staff and the use of its supplies and other resources.

38. Make Liberty Win will use a portion of YAL's contributions made during each and every election cycle in Montana after the 2026 election cycle to support or oppose the outcome of a vote of the Montana electorate.

39. YAL has actual knowledge of, encourages, and supports Make Liberty Win's continued use of its financial contributions to support or oppose the outcome of a vote of the Montana electorate during each and every election cycle in Montana after the 2026 election cycle.

40. By continuing to associate with Make Liberty Win through its financial contributions and by expending money or something of value through the work of its staff and the use of its supplies and resources after the 2026 election cycle, YAL will indirectly finance the exercise of political spending power, as defined in I-194 § 3, in the state of Montana by expending money or something of value to support or oppose the outcome of a vote of the Montana electorate.

41. In the 2026 Montana election cycle and in election cycles prior to the 2026 Montana election cycle, YAL associated with and will continue to associate in all future Montana election cycles with Make Liberty Win to act in concert or in conjunction to directly or indirectly undertake, finance, or direct the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

42. In the 2026 Montana election cycle and in Montana election cycles prior to the 2026 Montana election cycle, YAL associated with and it will continue to associate with Make Liberty Win to act in concert or in conjunction to expend money or things of value to support or oppose the outcome of a vote of the Montana electorate in each and every Montana election cycle after the 2026 Montana election cycle.

43. Absent injunctive relief, once I-194 takes effect on January 1, 2027, YAL will be forced to stop its association with Make Liberty Win with respect to Make Liberty Win's operations in Montana.

**Make Liberty Win**

44. Plaintiff Make Liberty Win ("MLW") is a philosophically conservative political action committee dedicated to promoting and advancing the principles of liberty and freedom. Its team of activists

diligently canvasses neighborhoods, connects with voters, and promotes conservative values in as many as forty states across the Nation, including Montana. MLW's efforts ensure its message strikes a chord with a diverse range of constituents, contributing to its success in elections, measured by the election of liberty-minded candidates in primary and general elections, including elections in Montana.

45. MLW pursues its activities described in this complaint to support or oppose the outcome of a vote of the Montana electorate.

46. MLW is not owned by any candidate, political party, or other political committee.

47. Prior to the 2026 election cycle, MLW directly or indirectly undertook, financed, or directed the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

48. Prior to the 2026 election cycle, MLW expended money or things of value to support or oppose the outcome of a vote of the Montana electorate.

49. Because YAL financially contributes more than 90% of the funds MLW expends to support its activities, YAL financed MLW's activities in Montana.

50. In the 2020 Montana election cycle, MLW spent approximately $52,000 on direct mail, phone banks, literature distribution and peer-to-peer texts to support or oppose the outcome of a vote of the Montana electorate.

51. In the 2022 Montana election cycle, MLW spent approximately $56,600 on direct mail, phone banks, literature distribution and peer-to-peer texts to support or oppose the outcome of a vote of the Montana electorate.

52. In the 2024 Montana election cycle, MLW spent approximately $123,000 on direct mail, phone banks, literature distribution and peer-to-peer texts to support or oppose the outcome of a vote of the Montana electorate.

53. During the 2026 election cycle, MLW directly or indirectly undertook, financed, or directed the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

54. During the 2026 election cycle, MLW expended money or things of value to support or oppose the outcome of a vote of the Montana electorate.

55. In the 2026 Montana election cycle, MLW spent approximately $370,000 on direct mail, phone banks, literature distribution and peer-to-peer texts to support or oppose the outcome of a vote of the Montana electorate.

56. In each and every election cycle after the 2026 election cycle, MLW will directly or indirectly undertake, finance, or direct the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

57. MLW will expend money or things of value to support or oppose the outcome of a vote of the Montana electorate in each and every election cycle after the 2026 election cycle.

58. In the 2026 Montana election cycle and in election cycles prior to the 2026 Montana election cycle, MLW associated with and will continue to associate in all future Montana election cycles with YAL to act in concert or in conjunction to directly or indirectly undertake, finance, or direct the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

59. In the 2026 Montana election cycle and in Montana election cycles prior to the 2026 Montana election cycle, MLW associated with YAL

and it intends to continue to associate with YAL to act in concert or in conjunction to expend money or things of value to support or oppose the outcome of a vote of the Montana electorate in each and every Montana election cycle after the 2026 Montana election cycle.

60. Although I-194 states that it does not restrict the lawful activities of political committees, I-194 § 5(5), it prohibits the artificial persons that fund MLW—including YAL, which provides more than 90% of the funds MLW expends—from contributing to MLW so that MLW can support or oppose the outcome of a vote of the Montana electorate. I-194 therefore deprives MLW of the funds it uses to speak in Montana and burdens MLW's right to associate with its contributors.

61. Absent injunctive relief, once I-194 takes effect on January 1, 2027, MLW will be forced to stop its association with YAL with respect to MLW's operations in Montana.

**Montana Mining Association**

62. The Montana Mining Association ("MMA") is a Montana trade association dedicated to assisting mining companies, small miners and allied trade members succeed in Montana's complex business and

regulatory environment. The primary purpose of MMA is to protect and promote the mining industry in the state of Montana.

63. MMA protects and promotes Montana's mining industry by supporting or opposing the outcome of a vote of the Montana electorate.

64. MMA's members, and the mining industry more generally, rely on MMA to advocate for mining on their behalf, including by raising awareness of candidates or ballot issues that would help or harm mining in Montana.

65. MMA is not owned by any candidate, political party, or political committee.

66. MMA is an entity whose existence is conferred on it by the state of Montana.

67. It is an "artificial person" as defined in I-194 § 3.

68. Prior to the 2026 election cycle, MMA directly or indirectly undertook, financed, or directed the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

69. Prior to the 2026 election cycle, MMA expended money or things of value to support or oppose the outcome of a vote of the Montana electorate.

70. In the 2018 Montana election, MMA and its members donated to a political committee, and in doing so spent millions of dollars to oppose I-186, as well as substantial amounts of time and energy coordinating a campaign against I-186.

71. In 2023, MMA dissolved its prior political committee and split the remaining funds (approximately $4,000) between the Democratic Legislative Leadership Council and the Republican Legislative Leadership Council.

72. In the 2024 Montana election cycle, MMA made social media posts to support or oppose the outcome of the vote of the Montana electorate. Additionally, MMA publicly endorsed Cory Swanson for Chief Justice and Dan Wilson for Associate Justice on the Montana Supreme Court.

73. In the 2026 Montana election cycle, MMA made social media posts, coordinated opposition among industry groups, and was a party to legal challenges challenging I-194 and its predecessor initiatives. Additionally, MMA made direct contributions to Dan Wilson's campaign for Associate Justice on the Montana Supreme Court. MMA also contributed approximately $500 a piece to both the Montana Democratic Legislative Campaign Committee and the Montana

Republican Campaign Committee. And MMA made contributions to several political committees, including a $22,500 donation to Montanans for Free Speech.

74. By conducting the business practices described in the preceding paragraphs in Montana, MMA expends money or something of value through the work of its staff and the use of its supplies and resources to support or oppose the outcome of a vote of the Montana electorate.

75. During the 2026 election cycle, MMA directly or indirectly undertook, financed, or directed the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

76. During the 2026 election cycle, MMA expended money or things of value to support or oppose the outcome of a vote of the Montana electorate.

77. In each and every election cycle after the 2026 election cycle, MMA will directly or indirectly undertake, finance, or direct the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

78. MMA will expend money or things of value to support or oppose the outcome of a vote of the Montana electorate in each and every election cycle after the 2026 election cycle.

79. Absent injunctive relief, once I-194 takes effect on January 1, 2027, MMA will be forced to stop engaging in political speech by expending money or anything of value to support or oppose the outcome of a vote of the Montana electorate.

**PAC Management Services LLC**

80. PAC Management Services LLC ("PAC MS") provides services to state and federal political action committees, candidate committees, party committees, and other organizations engaged in political and other advocacy work.

81. PAC MS is not owned by any candidate, political party, or other political committee.

82. PAC MS is an entity whose existence is conferred on it by the state of Delaware and it "is otherwise transacting business" in Montana. I-194 § 3(1).

83. It is an "artificial person" as defined in I-194 § 3.

84. Among the services PAC MS provides are Federal Election Commission and state government equivalent reporting and compliance, as well as treasury services, general consulting services for managing client organization operations, provides sub-vendors to make political communications and employs door-to-door canvassers to communicate political messages to the relevant electorate.

85. PAC MS provides these services in Montana, which is a thing of value, to support or oppose the outcome of a vote of the Montana electorate.

86. Consistent with Federal Election Commission regulations, *see* FEC Advisory Opinion 2021-07 (PACMS), PAC MS also does business as "VIP Gatekeeper."

87. VIP Gatekeeper connects active, elite, top-tier political donors—VIPs—with trusted, pre-approved political advisors—Gatekeepers—to maximize the impact of political giving. VIPs and their Gatekeepers can quickly, easily and effectively drive support to candidates that share their policy agenda.

88. More specifically, VIP Gatekeeper processes and streamlines financial contributions from large dollar donors to strategic contribution

opportunities to quickly raise contributions for key candidates and officeholders.

89. In 2026, VIP Gatekeeper processed financial contributions totaling $46,140 to Montana state legislative candidates/entities, $10,000 to Montana state political action committees, and $7,000 to Senator-elect Kurt Alme's campaign.

90. VIP Gatekeeper intends to continue its business practices of processing financial contributions to Montana candidates in all future elections.

91. The financial contributions that VIP Gatekeeper processes for state and federal Montana candidates for public office and Montana political action committees either support or oppose the outcome of a vote of the Montana electorate.

92. By conducting the business practices described in the preceding paragraphs in Montana, PAC MS, including when operating as VIP Gatekeeper, expends money or something of value through the work of its staff and the use of its supplies and resources to support or oppose the outcome of a vote of the Montana electorate.

93. During the 2026 election cycle, PAC MS directly or indirectly undertook, financed, or directed the exercise of political spending power, as defined in I-194 § 3, in the state of Montana.

94. PAC MS, including when it operates as VIP Gatekeeper, will continue to conduct its business practices as described in the preceding paragraphs in Montana and, therefore, expend money or something of value through the work of its staff and the use of its supplies and resources to support or oppose the outcome of a vote of the Montana electorate in each and every election cycle after the 2026 election cycle.

95. PAC MS will directly or indirectly undertake, finance, or direct the exercise of political spending power in the state of Montana in each and every election cycle after the 2026 election cycle.

96. Absent injunctive relief, once I-194 takes effect on January 1, 2027, PAC MS will be forced to stop its Montana business operations to avoid legal sanctions under I-194 for directly or indirectly undertaking, financing, or directing the exercise of political spending power in the state of Montana, and for expending money or something of value to support or oppose the outcome of a vote of the Montana electorate through the work of its staff and the use of its supplies and resources.

## Claims for Relief

### Count I

### I-194 violates Plaintiffs' Freedom of Speech Rights, both facially and as applied, in violation of the First and Fourteenth Amendments.

97. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

98. The First Amendment applies to Montana by operation of the Fourteenth Amendment.

99. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). This is no less true of the discussion of public issues that appear on the ballot in the form of ballot measures. See *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 790–92 (1978).

100. "It has been settled for [now well over] a century that corporations are persons within the meaning of the Fourteenth Amendment." *Bellotti*, 435 U.S. at 780 n.15 (citing *Santa Clara Cnty. v. S. Pac. R.R. Co.*, 118 U.S. 394 (1886); *Covington & Lexington Turnpike R. Co. v. Sandford*, 164 U.S. 578 (1896)).

101. "First Amendment protection extends to corporations." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). Indeed, "[t]his protection has been extended by explicit holdings to the context of political speech." *Id.* Consequently, "political speech does not lose First Amendment protection simply because its source is a corporation." *Id.* (internal quotation marks omitted). "Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Id.* at 343 (internal quotation marks omitted).

102. The Supreme Court "has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Id.*

103. I-194 deprives Plaintiffs of their First Amendment freedom of speech.

104. The Supreme Court "has long held that laws regulating speech based on its subject matter or communicative content are presumptively unconstitutional." *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (internal quotation marks omitted).

105. I-194 violates the First Amendment because it regulates the subject matter or communicated content of Plaintiffs' speech by forbidding them from speaking to support or oppose the outcome of a vote of the electorate.

106. The Supreme Court has "recognized, as well, the even greater dangers associated with regulations that discriminate based on the speaker's point of view." *Id.* at 641. "When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'" *Id.* (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).

107. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

108. By only applying to entities regulated by Title 35 of Montana Code Annotated and entities just like these in other states, I-194

discriminates against Plaintiffs' viewpoint in favor of the viewpoints of natural persons, a public body corporate and politic express identified as corporate and politic by statute, political committees organized under Montana law or federal law, and collective bargaining organizations formed under Title 39 of Montana Code Annotated that expend money or anything of value to support or oppose the outcome of a vote of the Montana electorate.

109. I-194 cannot avoid First Amendment scrutiny by relabeling its ban on political spending as a limit on "artificial-person powers." I-194 expressly makes the absence of political spending power "a condition of state-conferred legal status and charter privileges," I-194 § 4(2), and it penalizes protected political speech with forfeiture of limited liability, perpetual duration, and other charter privileges, I-194 § 7(1)–(2). The government may not condition a benefit on the surrender of First Amendment rights. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

110. By enforcing Initiative 194, Defendants, acting under color of state law, will deprive Plaintiffs of the right to freedom of speech in violation

of the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the Plaintiffs. Plaintiffs are therefore entitled under 42 U.S.C. § 1983 to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the Defendants' unconstitutional customs, policies, and practices; and attorneys' fees and expenses pursuant to 42 U.S.C. § 1988.

**Count II**

**I-194 violates Plaintiffs' Freedom of Association Rights, both facially and as applied, in violation of the First and Fourteenth Amendments.**

111. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

112. The First Amendment applies to Montana by operation of the Fourteenth Amendment.

113. "The First Amendment prohibits government from 'abridging . . . the right of the people peaceably to assemble . . . .'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 605 (2021) ("*AFPF*").

114. "[The Supreme] Court has long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others. Protected association

furthers a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *AFPF*, 594 U.S. at 606 (quotation marks and citation omitted).

115. "The First Amendment protects political association as well as political expression . . . . [Supreme Court] decisions have made clear that the First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas" *Buckley*, 424 U.S. at 15 (internal quotation marks omitted).

116. "Government infringement of this freedom can take a number of forms." *AFPF*, 594 U.S. at 606 (quotation marks omitted).

117. "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, because First Amendment freedoms need breathing space to survive." *AFPF*, 594 U.S. at 618-19 (internal punctuation marks omitted).

118. I-194 prevents Plaintiffs from associating with one another, and others like their member entities, through financial contributions to further activities that support or oppose the outcome of a vote of the Montana electorate.

119. By enforcing Initiative 194, Defendants, under color of state law, will deprive Plaintiffs of the right to freedom of association in violation of the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the Plaintiffs. Plaintiffs are therefore entitled under 42 U.S.C. § 1983 to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the Defendants' unconstitutional customs, policies, and practices; and attorneys' fees and expenses pursuant to 42 U.S.C. § 1988.

## Count III

## I-194 is overbroad in violation of the First and Fourteenth Amendments.

120. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

121. The First Amendment applies to Montana by operation of the Fourteenth Amendment.

122. In a First Amendment challenge, "the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied. *United States v. Hansen*, 599 U.S. 762, 769 (2023). This approach "provides breathing room for free expression." *Id.*

123. "Overbroad laws may deter or 'chill' constitutionally protected speech, and if would-be speakers remain silent, society will lose their contributions to the marketplace of ideas. To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Id.* at 769–70 (internal quotation marks and citation omitted).

124. "If the challenger demonstrates that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Id.* at 770 (internal quotation marks omitted).

125. I-194 bans all artificial persons other than political committees and public bodies—including corporations, limited liability companies, nonprofit associations, cooperatives, and trusts—from spending money or anything of value to support or oppose the outcome of a vote of the Montana electorate.

126. Nonprofit and for-profit corporations that are not candidate committees, ballot question committees, or political committees will violate I-194 by expending money or something of value through the work of their staff and the use of their supplies and resources in the ordinary course of their business of providing products or services to customers, clients, members, or interested individuals that seek them out.

127. Nonpartisan issue advocacy corporations will violate I-194 by publishing issue scorecards about candidates for public office on the Montana ballot and by engaging in other issue advocacy that is neither express advocacy nor its functional equivalent. Religious corporations will violate I-194 by taking positions on Montana ballot measures as part of their ordinary course of business of taking positions on moral issues of public concern. Retail corporations will violate I-194 by

advertising and selling books, movies, or music that discuss candidates for public office or ballot measures on the Montana ballot. Newspapers, television stations, and radio stations will violate I-194 by running political advertisements about candidates for public office or ballot measures on the Montana ballot—not as part of their bona fide news, commentary, or editorial content, but in the ordinary course of business of a for-profit corporation that sells advertising. Movie theatres and radio stations will violate I-194 by running entertainment that discuss candidates for public office that appear on the Montana ballot as part of these corporations' ordinary course of business. Plainly, any published utterance made by an employee of any type of corporation that is not uttered in performance of a bona fide news, commentary, or editorial function about any candidate or ballot measure appearing on any Montana ballot in any Montana locality is banned in Montana. And all these types of corporations are prohibited from associating with their members or customers in the furtherance of these speech activities either for commercial or not-for-profit purposes.

128. Plaintiffs PAC MS will be prohibited from providing its services in Montana.

129. By enforcing Initiative 194, Defendants, acting under color of state law, will deprive Plaintiffs of the right to freedom of speech and association in violation of the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the Plaintiffs. Plaintiffs are therefore entitled under 42 U.S.C. § 1983 to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the Defendants' unconstitutional customs, policies, and practices; and attorneys' fees and expenses pursuant to 42 U.S.C. § 1988.

## Prayer For Relief

Plaintiffs Young Americans for Liberty, Inc., Make Liberty Win, Montana Mining Association, and PAC Management Services LLC request that judgment be entered in their favor and against Defendants as follows:

a. An order preliminarily enjoining the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Initiative 194, as codified,

implemented, or enforced through Montana's statutes, rules, or regulations, during the pendency of this action;

b. An order permanently enjoining the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Initiative 194, as codified, implemented, or enforced through Montana's statutes, rules, or regulations;

c. A declaratory judgment under 28 U.S.C. § 2201 that Initiative 194, as codified, implemented, or enforced through Montana's statutes, rules, or regulations violates the First and Fourteenth Amendments to the United States Constitution, facially and as applied to Plaintiffs, and is void and unenforceable;

d. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

e. Any other relief this Court may grant in its discretion.

Dated: November 16, 2026

Respectfully submitted,

/s/ Gage Hart Zobell

Ryan Morrison*
**LIBERTY JUSTICE CENTER**
1629 K St., NW, Ste. 300
Washington, DC 20006
T: 512-481-4400
rmorrison@ljc.org

Gage Zobell (#13925)
Jensen Lillquist (#3252)
**DORSEY & WHITNEY LLP**
Millennium Building
125 Bank Street, Suite 600
Missoula, MT 59802
T: (406) 721-6025
zobell.gage@dorsey.com
lillquist.jensen@dorsey.com

*Attorneys for Plaintiffs*
* *Pro Hac Vice* Forthcoming